### BRYANT et al. v. SEAY et al.

No. 22695. Opinion Filed Nov. 17, 1931.

Rehearing Denied Feb. 9, 1932.

H. C. Thurman and Byrne A. Bowman, for petitioners.

Leo. J. Williams and M. J. Parmenter, for respondent.

KORNEGAY, J. This is an original proceeding to review an award of the Industrial Commission. The employee's first notice of injury and claim for compensation was received by the Industrial Commission on the 6th of March, 1931. It was signed by the claimant, Arthur Seay, and the name of his attorney, John J. Carney, 514 Security Building, Oklahoma City, was indorsed thereon. The cause of the accident given was "cement came in contact with left eye." The nature and extent of injury was "an undetermined injury to left eye." With reference to work, it stated that he did not cease work and that he had worked when

he could find employment since the date of the injury, and his average daily wage was $35 a week. This notice was dated the 21st of February, 1931.

On April 3, 1931, another notice was given in which it was claimed that the vision in both eyes was impaired, but vision of the right eye had been impaired previously, and since the accident the vision of the right eye was entirely gone; that claimant was discharged by the physician on December 11th, but did not quit work and continued to work at the same wage. He stated that he believed he would be disabled for the remainder of his life.

The hearing was had July 9, 1931, and objection was made because of his not having given the statutory notice to the employer within 30 days. This was overruled and the claimant was examined by his attorney, L. J. Williams, and testified that his wages averaged $150 to $200 a month, and that he got cement in both eyes and he was treated by Doctors Ferguson & Wails. His attorney suggested to him that he had had some trouble with his right eye for a long time, and asked about his ability to read with it, and claimant said he could. It was further suggested by his attorney that he had had trouble with that eye ever since he had had the measles when he was six years old, and claimant testified that he had never had any trouble with his other eye and that his left eye then bothered him. He was 32 years old and that he talked to Jones, the foreman, about the accident one week after the accident; that the accident occurred on the 9th, and he was on the well the next night and they ran three wells, and he had not worked any since except two weeks for the city. He used medicine in his eye for about a week; that his reason for delay about filing the claim was he thought his eyes would get better, but they were getting worse; that he did not want to put in a claim if his eyes got better. He described the accident as follows:

"One of the men gave a sack a sling. The cement dust struck me in the eyes and knocked me down. I had to feel my way out of the machine. It blinded my eyes."

He later stated that the cement that was in the sack hit him in the eye. The accident happened at 6:30 or 7:00, and he worked until 9 o'clock that night, and took treatment on his eyes next morning, and worked on a well until after midnight the next night. He had been engaged in carrying cement sacks and cement dust had gotten in his eyes before, but it had not bothered

him; that his trouble with his right eye was the measles; that his vision had not been as good in the right eye as the other. He had tried reading newspapers and letters, but he could not distinguish the letters; that his left eye was not as good as before the accident. In describing the test, he says:

"Q. How do you know not as good? A. Well, I know because I tested my eyes out and I know by the way I read, it hurts my eyes to read newspapers, the letters blur. Q. Well, they did that way with your right eye before? A. A little with my right eye."

As to his wages, he got $5 a well until they cut them down to $3; that during the summer they had five wells a day, and that was when they were getting $5 a well; that figuring it all the way through, he averaged something like $150 or $200 a month.

The Commission interrogated him after his attorney ceased, and he stated he did not notify his boss at the time, but the next morning his eyes were hurting, and Jones was not there, and he went to the Von Wedel clinic. It was a week or 10 days afterwards that he notified Jones; that Jones was on the job when he got hurt. At page 21, he was questioned by the Commissioner as follows:

"Q. Mr. Seay, in your own way, state about how much time you lost on account of this accident? A. Well, I haven't worked any since, only just this city work is all— the two weeks on that. Q. On account of your eyes, the condition of your eyes? A. Yes, sir. Q. Due to this accident of December 9th? A. Yes, sir. That is all."

He was cross-examined and he stated that he made about three wells after the accident. Being asked why he said the cement in his eyes caused him to be out of work, his reply was:

"Well, I knew there would be no use of my applying for a job or taking a job, because I would have to take an examination or lose my job."

He further stated he did not apply for a job because he did not think there was any use if his eyes kept getting worse; that all he had done since was cut some weeds for the city, and he had been out of work since he got the cement in his eyes, and he had not applied because he did not think they would take him on account of his eyes.

Dr. Shelton testified on behalf of the claimant. He was an eye, ear, nose, and throat specialist, and had examined the claimant twice, first on April 18, 1931, and on June 29, 1931. The history as detailed

to Dr. Shelton was that cement was thrown in both eyes, and he was treated two days by Doctors Ferguson & Walls, and given treatment to use at home; that his right eye had been weak since he was six years old and was the result of measles settling in that eye; that he had a reduction of vision in the right eye before the accident and it had been made worse; that there was considerable scarring over the cornea in the right eye, involving the whole of the pupillary area. The cornea in the left eye was free from scars. That the media of both eyes was otherwise clear, and fundus, reflexes, tunics, and tension normal. There was a vision of 20/300 in the right eye, and 20/30 in the left eye on April 18th. That the examination of June 29th was practically the same thing, except the visual acuity in the left eye was 20/50 admitted. There were no other changes; that in the right eye he had 20/300 vision, wh'ch means that he sees at 20 feet what he should see at 300 feet; that the eye would not be serviceable, and he could not read or see anything with that eye; that in the left eye he had 23½ per cent. loss of vision at the last examination, and 8½ at the first. Being interrogated at page 26 by a hypothetical question, he stated that he had no idea as to what the loss of vision from the measles was, but, as a rule, where a disease of this kind affects the eye, it leaves an ulcer, but the corneal area appeared more dense in the pupillary area, and this condition could be accounted for from the cement in the right eye, but as to whether or not it was, he had no way of knowing; that there was no pathology in the left eye to account for a loss of vision. He stated that the loss of vision in the right eye was 91.8 per cent; that it was impossible to tell how much of it was attributable to the cement dust; that he was unable to account for the loss of vision, as there was not sufficient pathology to base it on, and that usually when loose cement got into a man's eye, it scarred the outer surface; that he did not say either way as to whether the cement caused the condition in the left eye; that the loss of vision in the left eye could have been of long standing; that he could not say that the increase of loss of vision from 8½ per cent. to 23½ per cent. was caused by the cement going in his eye; that he thought he could do ordinary manual labor at that time; that he found no evidence of malingering; that notwithstanding he found no pathology in the left eye, he could not say that the cement had nothing to do with it; that there were no objective symptoms to cause the loss of vision in the left eye; that very frequently they found loss of vision with no pathology. He was interrogated by the Commission, and in response to a question, he stated that with the history that the claimant gave him, his opinion would be, that loss of vision occurred from the accident of December 9th, and the Commission asked if he found some scarring on the right eye, and he said, "Yes, dense scarring," but he could not tell how old it was; that in most cases it was in the form of an ulcer; that there was some opacity in the front part of the cornea, and that there was a nebula over the entire surface of the cornea, which is usually found in any kind of a burn. He expressed the opinion that the cement caused the trouble.

On redirect examination, he stated that claimant could see to get about with the right eye, but it would not be industrial or beneficial. He was interrogated by the Commission on page 33 as follows:

"Q. Doctor, assuming the claimant had measles when he was six years old, and he has testified that some of his vision was gone, he did not know how much, but that he could read a newspaper and get around as an ordinary person could since that time, and on December 9th, he got cement in his eye--could you say he is suffering now, in your opinion, from the cement that he got in his eye? A. That is hard to answer—I do not think he could see to read a newspaper with that eye at the present time. Q. For ordinary work, manual labor, he is the same as a one-eyed man, is he not doctor? A. If he would lose his other eye, he would be totally incapacitated from industrial pursuit."

On re-cross-examination he stated that he had sufficient sight in the left eye to do ordinary manual labor. The attorney for the claimant sought to get the doctor to make an estimate as to the loss of visual acuity in the right eye, but he said he could not make an estimate, and it was followed by ask'ng about reading a newspaper a foot from the eye, and he said he never had to make a te-t, and could not express an opinion on it, and that it would be a usable eye if he could read ordinary newspaper print.

Dr. Westfall testified on behalf of the carrier. He made an examination on the 8th of July, 1931. The history, as given by the claimant, was that he only asked for treatment of the left eye by Doctors Ferguson & Wails, and that he lost no time from work, but that both eyes had bothered him since the injury. That he had measles when a child and reading now bothered him, and he had headaches two or three times a week,

usually in the afternoons. In his left eye there was 20/20 vision. The right eye showed considerable scarring and the scarring was old. He could not tell whether it was acquired before December. 1930, or not; that it might have been acquired when he had the measles, but he did not know. The attorney for the carrier inquired about his opinion with reference to a newspaper that he could read one and a half feet from his eyes, and the doctor stated that that would not be conclusive; that he had an idea when the scar was acquired, but it would not permit him to say when it took place. At page 37, the carrier's attorney put this question:

"Q. He had a considerable loss of vision before he got that cement in his right eye if he had to place a newspaper that close to his eyes? A. That is not the only thing that would make a man place a newspaper close to his eyes, any near-sighted person would do that."

He stated that, in his right eye, he tested him, and he said he could not count the fingers; but from the appearance of his eye he had lots of useful vision in that eye. And he finally stated that there was 10 per cent. vision left in the right eye. He then stated there was no pathology in the left eye to account for a loss of vision. It was very clear that this witness thought there was a good deal of exaggeration on the part of the claimant as to his seeing qualities. He was not cross-examined by attorney for claimant, but was interrogated by the Commission, and he stated that it is possible for a man to lose the vision in his eye by cement getting into it, but it usually affected the retina, and that there was no scar tissue on the left eye and a few on the right eye.

There was an adjournment, and Dr. J. P. McGee, on the 10th of June, testified for the carrier. He first examined the claimant on the 10th of December, 1930, and claimant gave no history of cement having gotten into his right eye. The examination showed that the inside of the conjunctiva of his left eye was reddened, the cornea was clear, the media was clear, and the fundus was normal. There was no scarring, and he presumed that the reddening occurred from the cement, but this could have nothing to do with the vision. He examined the claimant again on the 27th of April, and the claimant gave him the history of having suffered a loss of vision in each eye, but more in the right eye, and claimed headaches. At this time, on April 27, 1931, he examined the eyes and the left eye showed a 20/50 vision, but was improved by the

use of lens to 20/20, and there was no loss of vision in the left eye arising from the cement getting into the eye. He had a vision of 10/200 in the right eye that was not improved by glasses. There was a 5 or 10 per cent. remaining sight in the eye. It was an old scar when he came in originally, and he claimed that it was due to an injury received when he was a very small boy, and the doctor did not think that the cement caused the scarring.

The claimant was recalled and was asked by Mr. Bowman why, when he came up to see Dr. McGee, he did not say anything about the cement being in his right eye. His reply was that he feared that they might bandage up both eyes and he did not want to lose out on the job, as there were some wells coming in right away; that he could see to get around. On examination by the court, he stated that they did not put a bandage over his left eye. Some evidence was taken as to who the insurance carrier was, and evidently to the satisfaction of the Commission it was found that the insurance carrier is the present petitioner.

The award was made on the 11th of July, 1931, finding that claimant was engaged in manual labor and in the employ of the petitioner, and while so engaged he sustained an accidental personal injury by dry cement being thrown into both eyes, and his average daily wage was $5, and that as a result of the accident the claimant received a permanent partial disability of 90 per cent. loss of vision of the right eye and 20 per cent. loss of vision of his left eye, making 55 per cent. for both eyes. There was a further finding that the claimant had a 10 per cent. loss of vision prior to the accidental injury as a result of measles. The Commission then fixed compensation on the basis of 55 per cent. of 500 weeks, making 275 weeks at $18 per week.

Complaint in the brief is made of this finding and a recital of the evidence is given, and discussion is had as to the injury to the right eye and the left eye, and what the testimony was. The first contention is that the finding that the claimant had 10 per cent. loss of vision of the right eye prior to the accident, and he suffered a 90 per cent. loss of vision on account of the accident, is not sustained by the evidence. The case of Wise-Buchannan Coal Co. v. Risco, 150 Okla. 190, 1 P. (2d) 411, is cited as showing that the burden was not sustained in this case that was thrown on the claimant to establish the condition of his eye before the accident, and we are asked to reverse this award on

account of the finding. The same way with reference to the finding as to the 20 per cent. loss of vision in the left eye. The same contention as to the employment by Bryant and Northfield Cementing Company. Criticism is made about not finding whether the cement company is a corporation or an individual.

The evidence as to the employment in the case, and as to who the insurance carrier was, appears to us to be sufficient to reasonably support the conclusion that the indemnity company was the insurance carrier and Bryant was the employer, in view of the fact that no representative of the company or Bryant appeared to explain the testimony of the record keeper as to who the carrier was, and the employer did not appear to dispute the testimony of the claimant as to whom he was working for. He evidently was working for somebody, and he claimed that that person was Bryant, doing business as the Northfield Cementing Company.

Under the law, we are bound by the findings of fact of the Commission, if there is evidence to base it on. Coming to the question of the injury, the testimony as to the injury is not as clear as it might be. If it were an open question, we might decide differently from what the Commission did as to the extent of these injuries. The evidence, however, was conflicting, and under the law giving us jurisdiction to review the action of the Industrial Commission and giving jurisdiction to review its award, the findings of fact of the Commission are binding here. Each side had experts. The doctors differed. The history of the claimant with reference to his injury to his right eye largely was his own. His explanation as to why he did not tell Dr. McGee about the cement getting into his right eye is rather extraordinary, but it might tend to establish that he had a pretty good right eye, because he wanted to keep it unbandaged so he could work, though at the same time he testified:

"Q. You could not see very well could you? A. I could see to get around."

This would tend to show that he did not have an "industrial eye," as it is sometimes called. Also, his statement, as claimed by Dr. McGee to have been made to him when he examined him as to the condition of his right eye being due to an injury when he was a very small boy, unexplained, tends to establish the fact that he had a very poor eye so far as industry was concerned, but one that he was willing

to risk in industry, and does not carry the abiding assurance that ordinarily is required in legal proceedings. However, human belief is not always on logical lines, and, under the law, the Commission is specially delegated with the right to pass upon these questions of fact, and we are forbidden to interfere.

We accordingly affirm the award.

LESTER, C. J., CLARK, V. C. J., and RILEY, HEFNER, and McNEILL, JJ., concur. SWINDALL, J., dissents. CULLISON and ANDREWS, JJ., absent.